**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

In re:

JEFFREY ALAN STYERWALT,

Debtor.

Bankruptcy Case No. 19-11247 TBM
Chapter 13

_____

**MEMORANDUM OPINION AND ORDER**
**DENYING CONFIRMATION OF CHAPTER 13 PLAN**
_____

### I.  Introduction.

Chapter 13 of the Bankruptcy Code[1] "affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property." *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1690 (2015).  The *quid pro quo* is a Chapter 13 plan.  A debtor must propose and obtain Court approval of a "plan under which [the debtor] pay[s] creditors out of . . . future income."  *Hamilton v. Lanning*, 560 U.S. 505 (2010).  Under Section 1325(b), if a Chapter 13 trustee or creditor objects to a Chapter 13 plan, then a debtor must either pay all claims in full or commit "all of the debtor's projected disposable income" to Chapter 13 plan payments over a period between three and five years.  It is a very tough bargain — the vast majority of Chapter 13 cases fail.

In this bankruptcy proceeding, the Debtor, Jeffrey Alan Styerwalt (the "Debtor"), proposed a Chapter 13 plan.  The Chapter 13 Trustee, Adam Goodman (the "Chapter 13 Trustee"), objected, asserting that the Debtor failed in his plan to commit "all of the Debtor's projected disposable income" as required.  The Chapter 13 Trustee contended that the Debtor was "shielding income" from his creditors by failing to include alleged bonus income, proposing unreasonable charitable contributions, and refusing to increase Chapter 13 plan payments after the payoff of certain loans.  He also alleged that the Debtor had not proposed the Chapter 13 plan in good faith.  The Debtor contested each of the objections through trial.

The Chapter 13 plan and objections present a myriad of very difficult legal issues.  The case also is hard in other ways.  The Debtor has struggled, and continues to struggle, financially and healthwise.  But, he has been credible and transparent throughout the bankruptcy process.  In the end, the Court overrules all of the Chapter 13 Trustee's objections — save one.  Since it is "known or virtually certain" that the

---

[1]     All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

Debtor will have more "projected disposable income" when he pays off two loans during the term of the plan, he must "step-up" or increase his plan payments to other creditors then. The Debtor's failure to propose increased plan payments after the loan payoffs dictates that the plan cannot be confirmed. However, if the Debtor resolves that objection through an amendment to the plan, the Debtor may be able to obtain confirmation.

## II.    Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334. The plan confirmation dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(L) (confirmation of plans), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    Procedural Background.

The Debtor filed for relief under Chapter 13 of the Bankruptcy Code on February 25, 2019 (the "Petition Date"). The same day, he filed his original Chapter 13 plan. (Docket No. 8.) The Chapter 13 Trustee and Wells Fargo Bank, N.A., objected to the original Chapter 13 plan. (Docket Nos. 13 and 14.) So, the Debtor submitted a second Chapter 13 plan. (Docket No. 18.) Again, the Chapter 13 Trustee objected. (Docket No. 21.) As his third effort, on June 19, 2019, the Debtor filed the current plan. (Docket No. 26, hereinafter, the "Plan.")

The Plan is fairly straight-forward and consistent with L.B.R. 3015(b)(1) and L.B.F. 3015-1.1. The Debtor proposes to make 60 monthly payments of $465 to the Chapter 13 Trustee. Over the term of the Plan, the proposed payments tally to $27,900. Such amount will be used to pay: attorney's fees and costs ($5,400); delinquent federal and state taxes ($4,139); a small mortgage arrearage ($297); and Chapter 13 Trustee fees ($2,790). The remainder ($15,274) is dedicated toward payment of non-priority general unsecured claims. Since creditors filed non-priority general unsecured claims totaling $82,395, the Debtor effectively proposes to pay such claimants about 19% of their claims (assuming that all filed claims are ultimately allowed in full). The Debtor is current on Plan payments, though he generally makes his payments a bit late each month.

A couple of weeks after the Debtor submitted his last Plan, the Chapter 13 Trustee filed his Objection (Docket No. 28, hereinafter cited as "Obj."). The Chapter 13 Trustee presented four main arguments against confirmation under Sections 1325(a)(3), (b)(1), and (b)(2). First, he contends that the Debtor is shielding income from his creditors by excluding future bonuses from his projected disposable income calculation and refusing to turn over any future bonuses to the Chapter 13 Trustee. Second, he asserts that the Debtor's proposed charitable contributions are excessive and unnecessary. Third, he contends that the Debtor's failure to provide for an increase in Plan payments after two loans are repaid improperly shields projected disposable

2

income from his creditors.  Fourth, he suggests that the Plan has not been proposed in good faith.[2]

Given the confirmation impasse, the dispute proceeded to trial.  Prior to the evidentiary hearing, the Debtor and the Chapter 13 Trustee agreed to certain facts, as set forth in the "Stipulated Facts Regarding Confirmation Hearing of September 18, 2019."  (Docket No. 35, hereinafter cited as "Stip. Fact".)  The Chapter 13 Trustee also filed a legal brief on the disputed issues.  (Docket No. 34.)  The Court conducted a contested confirmation hearing on September 18, 2019.  Both the Chapter 13 Trustee and the Debtor called a single witness:  the Debtor.  The Debtor's testimony was uncontroverted and credible.  In terms of other evidence, the Court admitted the Debtor's Exhibits A-J and the Chapter 13 Trustee's Exhibit 6.  At the conclusion of the evidence, the parties presented the Court with their oral closing arguments.  Thereafter, the Court took the dispute under advisement and now issues its decision.

## IV.    Findings of Fact

Based upon the evidence presented at the trial and the Stipulation of Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

## A.    The Debtor's Background and Employment.

The Debtor is 56 years old and resides in Castle Rock, Colorado.  He and his wife divorced six years ago in a fairly contentious manner.  He is the father of two adult children, both of whom live out of state, and the grandfather of a young grandson.  The Debtor is a graduate of Furman University (South Carolina).  During his undergraduate studies, he focused on business and Spanish.  He received a Bachelor of Sciences degree.  Since graduation, the Debtor has worked primarily in private industry.

For someone who has worked his entire adult life, the Debtor's financial circumstances are fairly modest.  He testified that he was "wiped out" during his difficult divorce six years ago.  Then, he lost his fairly high-paying job.  The Debtor attributes his need for bankruptcy protection to the lingering effects of his divorce and job loss as well as his failure to timely adjust to his own changed financial circumstances.

In any event, the Debtor was forced to accept a couple of lower-paying jobs before joining ProGroup Inc. ("ProGroup") about four and a half years ago as a merchandise manager.  (Stip. Fact No. 8.)  ProGroup is a large Colorado-based merchandising and marketing firm.  It operates primarily in the hardware industry.  ProGroup supports independent retail hardware stores that compete with national "big-box" companies.  Although the Debtor has experienced his share of employment challenges in the past, and still has not returned to his high pre-divorce salary level, he considers his employment at ProGroup stable and secure.

---

[2]    In the Objection, the Chapter 13 Trustee identified some additional concerns about the Plan and requested more documentation.  However, those other objections were not pursued by the Chapter 13 Trustee.  Thus, they are deemed waived and the Court need not address them.

## B.   **The Debtor's Assets and Liabilities**.

### 1.   **Assets**.

After the Debtor's divorce, he was left with one main asset: his home.  The Debtor owns 4375 McMurdo Court, Castle Rock, Colorado (the "Real Property.") (Exhibit D.)  The Debtor values the Real Property at $492,000.  (*Id.*)  However, his secured lender has a lien of $418,344 on the Real Property.  So, the Debtor has some equity; albeit less than the standard Colorado homestead exemption.  He owns an old car — a very high-mileage 2004 Acura — worth about $3,200.  (Ex. D.)  The Debtor's non-exempt assets consist of a small bank account, some household goods, furnishings, sports equipment, and clothes that altogether tally up to about $4,771 in value.  (*Id.*)  It is not that much.  But, he does also have some retirement savings: about $68,000 in a "401(k) or similar plan" (the "401(k) Account").  (Ex. D.)[3]  Even that is really not a lot for someone on the wrong side of 50 years old and approaching retirement age in the next decade or so.

### 2.   **Liabilities**.

The Debtor's debt picture is not particularly complex.  Fifteen creditors filed proofs of claim against him.  (Stip. Fact No. 5.)  Far and away the biggest claim is the Debtor's $418,344 mortgage.  (*Id.*)[4]  To his credit, the Debtor was mostly current with his monthly mortgage payments before bankruptcy.  The pre-petition mortgage arrearage was only $297.  The Debtor did get a little behind on his taxes.  He owes the Internal Revenue Service $3,594 and the Colorado Department of Revenue $762.  (Exs. B and C.)  Most, but not all, of the tax debt is priority under 11 U.S.C. § 507(a)(8).  (*Id.*)  The rest of the creditors are mostly banks, credit card issuers, and debt collection companies.  The Debtor's non-priority unsecured debt totals $82,395.  (Stip. Fact No. 5.)[5]

## C.   **The Debtor's Income and Expenses**.

### 1.   **General Income and Expenses**.

As set forth above, the Debtor works as a salaried merchandise manager for ProGroup.  His job is his only source of income.  His annual salary is about $102,900 (including about $900 which constitutes reimbursement by ProGroup for the Debtor's

---

[3]      The Debtor actually identified two retirement accounts that together total $68,000.  But since the Debtor did not provide separate balances, and for ease of reference, the Court refers to the two retirement accounts singly and simply as the "401(k) Account."  Furthermore, the Debtor has taken loans from the 401(k) Account which are not reflected in the $68,000 balance.  Put another way, the value of the 401(k) Account is $68,000, but only if the loans from the 401(k) Account are repaid.

[4]      Stipulated Fact No. 5 states that the mortgage debt on the Real Property is $419,046.  However, the secured lender's proof of claim is for slightly less: $418,344.  The difference is not particularly material.  The Court uses the figure from the lender's own proof of claim.

[5]      The Debtor's Schedule E/F disclosed $111,576 in non-priority unsecured debt.  (Stip. Fact No. 2.) But, some of the listed creditors did not timely file proofs of claim against the Debtor.

annual telephone expenses).  Converting the Debtor's annual salary to a monthly figure, as reflected on his Schedule I, he earns about $8,575 of monthly gross income, exclusive of bonuses.  (Stip. Fact No. 3 and Ex. E-F.)  The Debtor's income greatly exceeds the median family income for a one-person household in Colorado, which is currently $61,500.  Thus, under Sections 707(b)(2) and 1325(b)(3), the Debtor is an "above-median-income" debtor.

From the Debtor's monthly gross income, ProGroup subtracts $3,855 monthly for a smorgasbord of various typical "payroll deductions": taxes; Medicare; Social Security; insurance; health care reimbursement; voluntary retirement contributions to the Debtor's 401(k) Account; and repayment of "retirement fund loans."  (Ex. E.)  As set forth below, one of the Chapter 13 Trustee's main quarrels is regarding the repayment of loans from the Debtor's 401(k) Account.  Currently, the Debtor's gross income is being docked $803 per month for such repayments.  In any event, after applying all the payroll deductions, ProGroup pays the Debtor combined monthly income of $4,720.  (Stip. Fact No. 3 and Ex. E.)

The Debtor set forth his monthly expenses on his Schedule J as $4,397.  (Stip. Fact. No. 4 and Ex. J.)  So, according to him, he is left with just $323 in "monthly net income."  (*Id.*)  His main expense is for housing — $2,554.  (Ex. J.)[6]  It seems like a lot for a single person with no dependents.  However, the Debtor testified credibly concerning his pre-bankruptcy efforts to reduce his housing expense.  He tried to sell the Real Property.  But he only had two showings in two months.  He stated that the real estate market in his area is soft, especially for an older house needing work.  He also researched apartments in and around Castle Rock.  What he found was quite spendy.  Decent one-bedroom apartments near his job are renting for about $2,200 per month and two-bedroom apartments are a couple hundred dollars more than that per month.  Based upon this information and considering the tax consequences for sale of his Real Property, the Debtor concluded that he would end up effectively paying more for renting an apartment than staying in the Real Property and making his mortgage payments.  His explanation seems plausible and even the Chapter 13 Trustee does not contest his housing expense.  Most of the rest of the Debtor's monthly expenses are modest, even low.  (Ex. E.)  For example, the Debtor calculates his food and housekeeping expenses at just $12.50 per day.  Suffice to say he does not go out to dinner much.  As set forth below, the Chapter 13 Trustee really contests only one of the expenses: $240 per month for "charitable contributions and religious donations."

So, the general numbers are: $8,575 for gross monthly income; $4,720 for net monthly income; and $4,397 of monthly expenses.  The Chapter 13 Trustee challenges the non-inclusion of bonus income, the Debtor's charitable and religious contributions, and the 401(k) loan repayment expense.

---

[6]     At trial, the Debtor testified that his mortgage payment expense has increased a bit to $2,607 per month.

2. __Bonus Income__.

The main rub in this dispute is the Debtor's bonus income.  He does not include it in his projections, but the Chapter 13 Trustee contends he should.  The Debtor's employer, ProGroup, offers its employees, as a group, the opportunity to be paid a bonus, provided that the company is financially successful.  (Stip. Fact No. 9.)  It is a sort of profit sharing.  Each year, the company sets a budgetary target for revenue.  The Debtor is not involved in setting the revenue target.  If the company meets or exceeds its revenue target in a particular year, each employee receives a bonus the next year.  (Stip. Fact Nos. 9-10.)  If the company does not meet its revenue target, none of the employees receives a bonus.  Under this system, bonuses are not guaranteed.  Put another way, both the Debtor and the Chapter 13 Trustee agree that the Debtor only has "the *potential* to receive bonus income . . . ."  (Stip. Fact No. 9 (emphasis added).)  In any event, ProGroup calculates bonuses after the calendar work year ends, and awards bonuses (if any) in February the following year.  The bonuses are paid on a gross basis; however, ProGroup withholds taxes and other amounts from such bonuses.  The Debtor does not have any control over whether a bonus will be awarded, nor over the amount of any bonus.  (Stip. Fact No. 9.)

In his almost five years of employment with ProGroup, the Debtor has received bonuses in the following years for the following amounts:

| Bonus Work Year[7] | Bonus Amount |
|---|---|
| 2015 | $2,500 |
| 2016 | $0 |
| 2017 | $9,000 |
| 2018 | $7,932 |
| 2019 | $0 |

(Ex. 6; Stip. Fact Nos. 11-14.)  With respect to the "bonus work year" 2019, the calendar year has not ended yet.  However, the Debtor testified that as a "team leader" he is aware of the ProGroup revenue target for revenue for 2019.  He stated that "sales are way down" and the company is at less than 72% of the revenue target. He confirmed that the performance is "worse than the first four years" of the Debtor's tenure with ProGroup.  Accordingly, the Debtor testified that he "doesn't see any possibility of a bonus" for 2019 (which would otherwise be calculated and awarded in February 2020).  Such testimony was both credible and uncontroverted.  Thus, the Court finds that the Debtor will not receive a 2019 bonus (or at least that the possibility is so low such that it should be considered as $0 for purposes of the Court's decision).  There is no real way to know for sure whether the Debtor will receive bonuses for 2020-2024 (the remaining years of the Chapter 13 reorganization process) and, if so, in what amounts.

---

[7]    "Bonus Work Year" refers to the calendar work year for which bonuses are awarded.  Actual payment of bonuses, if any, is made in February the following year.

### 3.   401(k) Loan Repayment.

The Debtor has a 401(k) Account valued at $68,000. But he took out two loans against his 401(k) Account. The first loan was made in December 2018 (the "First Loan"). Under the First Loan, the Debtor borrowed $13,200 for five years. (Stip. Fact No. 21.) To satisfy the First Loan, the Debtor committed to make repayments of $258.30 per month to his 401(k) Account until December 2023. (*Id.*)

The second loan was made in January 2019 (the "Second Loan"). Under the Second Loan, the Debtor borrowed $8,600 for about 18 months. (Stip. Fact No. 20.) The Debtor used the Second Loan proceeds to purchase a 2004 Acura vehicle and pay for associated expenses, such as sales tax and license plates. He chose to borrow from his 401(k) Account because of a favorable lower interest rate (6%) that made such borrowing more economical than market rates for vehicle loans (especially for someone on the verge of bankruptcy). To satisfy the Second Loan, the Debtor committed to make repayments of $530.22 per month to his 401(k) Account until July 2020. (*Id.*) After the bankruptcy, the Debtor has continued to repay the First Loan and Second Loan through a payroll deduction. And he proposes to continue to do so in his Chapter 13 Plan.

### 4.   Charitable Contributions.

The Debtor claims that he spends $240 per month on "charitable contributions and religious donations." (Ex. E.) The Chapter 13 Trustee challenged such amount. As noted by the Chapter 13 Trustee and demonstrated by the Debtor's federal income tax returns for 2016, 2017, and 2018, the Debtor historically has taken federal income tax deductions for "gifts to charity," but only in lesser amounts.

For 2016, the Debtor claimed a "gifts to charity" federal income tax deduction of $1,816 which equals $151 per month. (Ex. J.) For 2017, the Debtor claimed a "gifts to charity" tax deduction of $1,113 which comes out to $93 per month. (Ex. I.) For 2018, the Debtor claimed a "gifts to charity" tax deduction of $1,860 which equates to $155 per month. (Ex. H.) On a numerical basis, such amounts are materially below $240 per month.

The Debtor explained the discrepancy. He stated that he only claimed federal income tax deductions for "gifts to charity" if he had actual receipts (*i.e.*, documentary evidence), and did not claim tax deductions for gifts that were made in cash. So, the Debtor did his taxes on a conservative basis that did not actually reflect the full extent of his charitable giving. The Debtor's testimony was both credible and uncontroverted. Furthermore, the Debtor testified concerning his major donations. He attends church services twice weekly and donates about $10-20 per service. That tallies to $80-$160 per month. Also, the Debtor participates in somewhere between 6 to 16 Alcoholics Anonymous meetings per month (80 to 200 meetings per year). At each meeting he tries to make a small contribution to the organization. Assuming about $10 per meeting, the Debtor contributes about $60-$160 per month to Alcoholics Anonymous. Based upon the evidence concerning his contributions to his church and Alcoholics

Anonymous, coupled with the explanation as to why he took a lower tax deduction on his federal income tax returns, the Court finds that the Debtor has proved that he has historically spent about $240 per month — maybe more — on charitable contributions and religious donations.

### 5.    **Additional Future Expenses.**

On his Schedule J, the Debtor estimated his expenses "as of [his] filing date." (Ex. E.)  However, the Debtor also offered testimony concerning his current actual and likely additional future expenses.  It turns out the expenses listed on the Debtor's Schedule J are somewhat under-reported.  And the Debtor will likely be facing higher expenses in the future.

The Debtor's largest asset is his Real Property.  The mortgage payments for the house are also the Debtor's largest expense.  Since the bankruptcy case was filed, the Debtor's mortgage expense has increased by $53 per month.  His testimony established that the home needs serious additional work.  It has suffered hail damage.  And it needs to be painted, especially the numerous bare spots where the siding is showing.  So, the Debtor's home maintenance, repair, and upkeep expenses are likely to increase.

The Debtor's car, a 2004 Acura, is not in good shape.  He is almost certain to incur significant expenses in the next few years to make repairs.  The car was quite old — 15 years old — when he bought it just before he filed for bankruptcy protection.  The car has 142,000 miles already.  The Debtor testified that when he purchased the vehicle after taking out the Second Loan, his plan was to pay off the Second Loan over 18 months and then use what he was spending for repayment of the Second Loan to make necessary repairs to the car.  The 2004 Acura's air-conditioning is not functioning.  It needs a new clutch and wheel bearings.  The Debtor testified that these additional anticipated critical repairs alone will cost more than $5,050.  It is also likely that other repairs will be necessary.  Once the Debtor finishes repaying the Second Loan (at the rate of $530.22 per month) in July 2020, then the Debtor plans to save the "freed-up" $530.22 per month for the next ten months to start to make the necessary and critical repairs to the car in 2021.  Alternatively, if the car cannot be repaired, the Debtor will need to buy a new or used replacement vehicle in 2021 at a much higher cost.  None of the foregoing was contested by the Chapter 13 Trustee.  So, at least some additional vehicle expense is quite likely in these circumstances.

On his Schedule J, the Debtor listed $0 in medical expenses.  (Ex. E.)  The Debtor has a Health Spending Account (the "HSA").  His employer withholds $225 per month ($2,700 per year) and puts the funds in the HSA.  (Ex. E.)  He also has health insurance with a $4,000 annual deductible.  Before the bankruptcy filing, the Debtor may not have been spending much out of pocket for medical expenses because of his health insurance and the availability of the funds in his HSA.  But, his circumstances have changed.  The Debtor testified, perhaps a little too understatedly, that his health is "spotty."  During the first nine months of 2019, the Debtor has had 36 different doctor's appointments.  That averages a visit to a doctor about once a week.  Not surprisingly,

the Debtor testified that by the time of trial (in September 2019) he had already exhausted his HSA.  During 2019, he suffered from bleeding ulcers, a broken toe, and a sprained wrist.

But the main looming medical problem is the degeneration of the disks in the Debtor's neck and below the base of his skull.  He already has had five nerve block shots in 2019 to ease the pain; but the shots did not work.  The Debtor's medical professionals have recommended radiofrequency ablation as the most non-invasive first step to remedy the issue.  That procedure costs about $11,000.  If that works and insurance picks up most of the bill, the Debtor's out-of-pocket costs may be only a few hundred dollars in 2020.  But if radiofrequency ablation does not work, fusion or disk replacement surgery are indicated.  The cost of a neck surgery in 2020 is estimated at more than $100,000.  The Debtor anticipates that the out-of-pocket expense of such surgery would be $7,000-$8,000, which cost would exhaust the his HSA and any insurance deductible.  The Debtor provided documentary support for some of his medical expenses, thereby bolstering his testimony.  (Ex. G.)  The evidence establishes that something needs to be done about the Debtor's neck.  It is not getting better.

In addition to expenses for doctors, the Debtor also has started to incur new costs for medications.  His Patient Prescription Record shows more than 21 different types of prescribed medications in 2018-2019.  (Ex. G.)  The list reads like a pharmacy inventory.  The Debtor testified credibly that his out of pocket expense for medications is now at least $69 per month which was not factored in on his Schedule J.

## D.   **Other Factual Findings.**

The Court finds that the Debtor made substantial efforts to tighten his financial belt and avoid bankruptcy.  One example is his vehicle.  The Debtor purchased an inexpensive used car without air conditioning and with obvious mechanical problems rather than a more expensive automobile.  To save expense, he borrowed from his 401(k) Account because the interest terms were more favorable than those available at financial institutions.  He tried to sell his house.  But that did not work.  In any event, he ultimately determined that his housing expense would not actually be lower by renting an apartment in the same area.

The Debtor spends very little on groceries and personal items.  Amongst other bankruptcy cases, his expenses in these categories stand out as exceptionally low.  The Debtor has not taken a vacation since 2016.  He has not been able to afford to travel to meet his new grandson.  His only travel in recent years has been to help care for his father, who died of Alzheimer's last year, and his mother, who was serving as caretaker for his father and who now needs help to deal with her own declining health and depression following the loss of her spouse.  Understandably, the Debtor would have liked to travel more to see them, but he could not afford to do so.

The Debtor testified credibly that he is living paycheck to paycheck even while "protected" in bankruptcy.  Nevertheless, in his Chapter 13 Plan, he proposes to pay $465 per month over five years to his creditors and for administrative expenses.

Although the Court is not quite sure how he has been able to do so, somehow the Debtor has kept up with the Chapter 13 Plan obligations as well as his post-petition mortgage.  He is struggling, but committed to make it work.

## V.   Conclusions of Law

### A.   General Statutory Framework and Burden of Proof.

In contrast to Chapter 7 liquidation, Chapter 13 of the Bankruptcy Code "allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period."  *Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015).  Under 1322(a)(1), a Chapter 13 plan must "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." 11 U.S.C. § 1322(a)(1).

In relevant part, Section 1325(a) mandates that the court "shall confirm a plan" if:

> (1)   the plan complies with the provisions of this chapter and with the other applicable provisions of this title; . . . [and]
>
> (3)   the plan has been proposed in good faith and not by any means forbidden by law . . . .[8]

Section 1325(b)(1) states:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan —
>
> (A)   the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B)   *the plan provides that all of the debtor's projected disposable income* to be received in the applicable commitment period beginning on the date that the first payment is due under the plan *will be applied to make payments to unsecured creditors under the plan*.

(Emphasis added.)

---

[8]   Section 1325(a) also contains other confirmation requirements not at issue in this dispute.

Stated in plain English, "if a contested Chapter 13 plan does not provide for a 100% distribution on unsecured creditors' claims, the plan must provide 'that all of the debtor's projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan.'" *In re Trobiano*, 532 B.R. 355, 358 (Bankr. D. Colo. 2015) (citing 11 U.S.C. § 1325(b)(1)(B) and *In re Williams*, 394 B.R. 550, 562 (Bankr. D. Colo. 2008)) (ellipses in *Trobiano*).

With regard to evidentiary burdens in confirmation contests, the Debtor bears the burden of proving the required elements of Section 1325. *In re Melendez*, 597 B.R. 647, 657-58 (Bankr. D. Colo. 2019); *In re Vinger*, 540 B.R. 782, 786 (Bankr. D. Colo. 2015); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014)*; In re Toxvard*, 485 B.R. 423, 432 (Bankr. D. Colo. 2013); *In re Loper*, 367 B.R. 660, 664 n.5 (Bankr. D. Colo. 2007). The legal standard is the preponderance of the evidence. *In re Fassi*, 2013 WL 2190158, at *1 (Bankr. D. Colo. May 21, 2013) (citing *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 883 (9th Cir. BAP 2002)).

## B.   The Projected Disposable Income Objections.

In his Objection, the Chapter 13 Trustee asserts that the Debtor's Plan fails to commit "all of the debtor's projected disposable income" for the five-year commitment period in contravention of Sections 1325(b)(1)(B) and (b)(2). More specifically, the Chapter 13 Trustee makes three arguments. First, he contends that the Debtor fails to meet the projected disposable income requirement because the Debtor does not include as income anticipated future bonuses to be paid in the period from 2020 to 2024, thereby "shielding income from creditors." Obj. ¶ 1. Second, he asserts that the Debtor's proposed charitable and religious contributions — $240 per month — are neither reasonable nor consistent with "a written documented history" and thus may not be included as expenses for projected disposable income calculation purposes. Obj. ¶ 2. Third, the Chapter 13 Trustee argues that in order to satisfy the projected disposable income mandate, the Debtor must increase (or "step-up") payments under the Plan after the First and Second Loans from the Debtor's 401(k) Account are paid off in 2023 and 2020, respectively. Obj. ¶ 3. The Court will address each of the Chapter 13 Trustee's projected disposable income objections separately, but starts with a more detailed legal orientation.

Understanding the phrase "projected disposable income" is key to unlocking the confirmation puzzle. So, what does "projected disposable income" really mean? The answer requires a detour through some dizzying statutory cross-references. The Bankruptcy Code does not define "projected disposable income," but, under Section 1325(b)(2), the shorter term "disposable income" means:

> (2)   . . . current monthly income received by the debtor . . . less amounts *reasonably necessary* to be expended —
>
> (A) (i)  for the maintenance or support of the debtor . . .; *and*

> > (ii)     for [qualified] charitable contributions . . .  *in an amount not to exceed 15 percent of gross income of the debtor* for the year in which the contributions were made . . . . *and*

> > (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business . . . .

(Emphasis added.)  That definition is based upon the term "current monthly income," which itself is defined and more backward-looking than "current."  Section 101(10A) states that "current monthly income" means

> > . . . the average monthly income from all sources that the debtor receives . . . derived during the 6-month period ending on — (i) the last day of the calendar month immediately preceding the date of the commencement of the case . . . .

On the income side, in Chapter 13 cases, debtors file an Official Form 122C-1 "Statement of Current Monthly Income" ("Form 122C-1") wherein they are required to calculate their average monthly income during the six months before bankruptcy, thereby identifying their "current monthly income."  Debtors also are required to file an Official Form 106I "Schedule I Your Income," which mandates that debtors "estimate monthly income as of the date [they] file [the] form."  These are slightly different exercises.  Sometimes the income figures on Form 122C-1 and Schedule I match.  Sometimes they do not.

The expense side is even more complicated.  Below-median-income debtors calculating "disposable income" may subtract from "current monthly income" "amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor . . . ."  11 U.S.C. § 1325(b)(2)(A)(i).  This often equates with actual expenses.  Congress imposed different expense limitations for above-median-income debtors.  For above-median-income debtors calculating "disposable income," such debtors generally may subtract from "current monthly income" only specified expenses generally based upon Internal Revenue Service National and Local Standards.[9]  11 U.S.C. §§ 707(b)(2) and 1325(b)(3).  As explained in *Lanning*, "the formula for above-median-income debtors is known as the 'means test' and is reflected in a schedule [(Form 122C-2)] that a Chapter 13 debtor must file."  *Lanning*, 560 U.S. at 510 n.2.  Put another way, "Section 707(b)(2), commonly known as the 'means test,' sets out a structured method of calculating reasonably necessary expenses that is designed to reduce the discretion of bankruptcy courts and to ensure that [above-median-income] debtors pay more to their unsecured creditors."  *McCarty v. Lasowski (In re Lasowski)*, 575 F.3d 815, 818 (8th Cir. 2009).  Because the Debtor is an above-median-income debtor, the projected

---

[9]     As noted previously, charitable and religious contributions are excepted from "means test" treatment under Sections 707(b)(2) and 1325(b)(3).

disposable income calculation does not start with the Debtor's actual expenses. Instead, the Debtor's expenses must be determined generally based upon Internal Revenue Service National and Local Standards in accordance with Section 707(b)(2) and listed on Form 122C-2. After completing Form 122C-2, the Debtor identified his "monthly disposable income under § 1325(b)(2)" as only $308.55 (which is fairly close to the Debtor's proposed monthly Chapter 13 plan payment of $465).

To understate the obvious, the various bankruptcy definitions and forms create interpretative difficulties. But the United States Supreme Court solved the statutory Rubik's cube — at least in part — in *Lanning*, 560 U.S. 505. In that case, an above-median-income debtor received a large "one-time buyout" from her employer in the six months before her bankruptcy filing. The payment greatly inflated her "current monthly income" since such calculation is based upon a six-month lookback period under Section 101(10A) as also reflected on Form 122C-1. The debtor proposed a realistic Chapter 13 plan without counting the "one-time buyout." But, the Chapter 13 trustee objected and argued for a simple "mechanical approach" to "projected disposable income," contending that the debtor was required to use the inflated and backward-looking "current monthly income" figure and then multiply that number by the 60-month plan term. The result of that approach would have yielded a very high projected disposable income amount which all the parties agreed the debtor could not pay going forward. The debtor countered that argument by offering a more flexible "forward-looking approach" under which the "current monthly income" shown on Form 122C-1 or the income calculated on Schedules I and J, would serve as a starting point. However, the debtor contended that the "mechanical" computation should be adjusted "where significant changes in a debtor's financial circumstances are known or virtually certain." *Id.* at 513.

In an 8-1 decision, the Supreme Court adopted the "forward-looking approach" and ruled:

> The arguments advanced in favor of the mechanical approach are unpersuasive . . . .
>
> As the Tenth Circuit recognized in this case, a court taking the forward-looking approach should begin by calculating disposable income, and in most cases, nothing more is required. It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses.

*Id.* at 519. The *Lanning* decision governs all of the Chapter 13 Trustee's projected disposable income objections. Further, the standard requires a case-by-case assessment.

13

1.       **The Debtor's Potential Future Bonuses Need Not Be Included in the Projected Disposable Income Calculation.**

The Chapter 13 Trustee objects that the Debtor fails in his Plan to meet the projected disposable income requirement because the Debtor does not include as income anticipated future bonuses to be paid in the period from 2020 to 2024 and, thereby, is allegedly "shielding income from creditors." Obj. ¶ 1.  The Debtor's proposed payments to creditors in the Plan are based upon the Debtor's calculation of projected disposable income.  The Debtor started with his gross annual salary of $102,900 from ProGroup.  That amount equates to $8,575 of monthly gross income, which is what the Debtor listed on his Schedule I.  The Debtor also calculated his gross "current monthly income" on Form 122C-1 as $8,575.  (Docket No. 2.)  The calculation was made using the "average monthly income that [the Debtor] received from all sources, derived during the 6 full months before" he filed for bankruptcy protection.  *Id.*  He filed for bankruptcy on February 25, 2019.  The six-month look-back period under Section 101(10A) was from to August 1, 2018, to January 31, 2019.  During that period, the Debtor did not receive any bonus.  (Ex. F.)  So, the Debtor correctly excluded his later-received bonus[10] from the "current monthly income" calculation.  Even the Chapter 13 Trustee does not argue that the Debtor's Form 122C-1 calculation was wrong.  Furthermore, as noted previously, the Debtor's Schedule I lists the same figure ($8,575) for his monthly gross income as of the bankruptcy filing.  That amount also does not include any bonus.  The Chapter 13 Trustee does not contend that the Debtor's Schedule I was wrong either.

Following *Lanning*, the Debtor was required to "begin by calculating disposable income, and *in most cases, nothing more is required.*"  *Lanning*, 560 U.S. at 519 (emphasis added).  The Debtor did exactly what he was required to do and came up with $8,575 on both his Form 122C-1 and Schedule I — an amount that does not include any bonus.  The Supreme Court has advised that:  "It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses."  *Id.*

So, is this one of those "unusual cases" where the Debtor's future bonus income is "known or virtually certain"?  The answer is difficult; but ultimately the evidence demonstrates that this is not one of those "unusual cases" with "known or virtually certain" future bonus income over the term of the Plan.  The debtor is not guaranteed any bonus at all in the future.  Historically, it is true that ProGroup paid the Debtor a bonus for the 2015, 2017, and 2018 "bonus work years."  However, the amounts of such bonuses were highly variable and inconsistent.  For example, the high mark was 2017 when the Debtor received a $9,000 bonus.  But the 2015 bonus was much smaller (about 72% less than what the Debtor received for 2017).  And the 2018 bonus was also materially smaller (about 12% less than what the Debtor received for 2017).  So, there is no historical consistency in the bonus amounts even for work years in which bonuses actually were awarded.

---

[10]       The Debtor received a $7,932 bonus for the 2018 "bonus work year" on February 15, 2019.  The bonus was paid before the bankruptcy petition date, but not during the statutory 6-month look-back period as defined in Section 101(10A).

However, perhaps even more importantly, whether future bonuses will be awarded at all is itself uncertain.[11]  After all, the Debtor did not receive any bonus for 2016.  The uncontroverted evidence also confirms that the Debtor will not receive any bonus for 2019, because ProGroup's revenue targets are out of reach.  So, using a five-year sample, the Debtor has received (or expects to receive) bonuses three out of five years — which is just 60% of the time.  A historical pattern of receiving bonuses 60% of the time does not mean that the Debtor will receive bonus income that is "known or virtually certain" for 2020-2024.  And, the Court has no way of knowing the amount of any bonus that might be awarded anyway.

In their Stipulated Facts, the Debtor and the Chapter 13 Trustee agreed that the Debtor has "the *potential* to receive bonus income [in the future] . . . ."  (Stip. Fact No. 9 (emphasis added)).  Just so.  Nevertheless, "potential" is not the same thing as something "known or virtually certain."

The Chapter 13 Trustee tacitly accepts *Lanning*, 560 U.S. 505, as the governing standard but tries to convince the Court to deny confirmation with citations to mostly pre-*Lanning* decisions.  The Chapter 13 Trustee starts with *In re Foster*, 2006 WL 2621080 (Bankr. N.D. Ind. Sept. 11, 2006), a decision in which a bankruptcy court denied confirmation of a Chapter 13 plan on the basis that the debtor failed to include annual bonuses when setting proposed plan payments.  The case is easily distinguished on the law and facts.  Although *Foster* follows a "forward-looking approach," it does not use the "known or virtually certain" standard announced in *Lanning* many years later.  Instead, the bankruptcy court appeared to require the inclusion of bonuses using a lower legal standard: "anticipated for the future" instead of "known or virtually certain."  *Id.* at *8.  And, factually, the debtor received bonuses four years in a row before the bankruptcy in roughly similar amounts.  The bankruptcy court characterized the bonuses as "regularly received."  *Id.* at *7.  Even the debtor in *Foster* thought that she would continue to receive bonuses.  *Id.* at *1.  Those are not the facts in this case, where the Debtor received bonuses just 60% of the time and, even then, in wildly varying amounts.  The Chapter 13 Trustee also references another decision upon which *Foster* relied:  *In re Fuller*, 346 B.R. 472 (Bankr. S.D. Ill. 2006).  That decision did not involve bonus income but held that "the debtor's actual income as of [the petition] date should provide an appropriate starting point for determining how much she can commit to the plan."  *Id.* at 483.  That is correct.  But *Fuller* did not determine how any income adjustments should be made (whether with respect to bonuses or otherwise) and did not presciently adopt the *Lanning* "known or virtually certain" standard that was announced years later.

The Chapter 13 Trustee invites the Court to consider three other pre-*Lanning* confirmation disputes involving bonuses:  *Farmway Credit Union v. Senger* (*In re Senger*), 2009 WL 1269589 (Bankr. D. Kan. May 7, 2009); *In re Barnes*, 378 B.R. 774 (Bankr. S.C. 2007); and *In re Arsenault*, 370 B.R. 845 (Bankr. M.D. Fla. 2007).  These

---

[11]     The Court acknowledges that the $7,932 bonus for the 2018 "bonus work year" was paid on February 15, 2019.  So, it is "known or virtually certain."  But, it was paid before the bankruptcy petition and so in that sense is not "projected" or future income.

cases surely do support the Chapter 13 Trustee's position.  But again, none of them applies the tough "known or virtually certain" standard set in *Lanning*.

Aside from using different legal standards, some other features of the cases referenced by the Chapter 13 Trustee deserve mention.  In *Senger*, one of the enlistment bonuses had already been paid before confirmation while two future enlistment bonus increments were merely anticipated.  Regarding the two future enlistment bonus increments, the bankruptcy court stated that it was "left to its own devices" to determine whether such amounts should be "accounted for" in "projected disposable income."  2009 WL 1269589, at *5.  As best the Court understands the *Senger* decision, in the end, the bankruptcy court did not require that the two future enlistment bonus increments be included because the bankruptcy court decided it "cannot conclude definitively that the enlistment bonuses meet the condition of regularity."  *Id.* n.36.  In *Barnes* the bankruptcy court acknowledged that "the amount of future bonuses [was] unknown and somewhat speculative given the husband's brief work history with his current employer."  378 B.R. at 779.  Thus, the *Barnes* bankruptcy court did not require that anticipated future bonuses actually be factored into monthly Chapter 13 plan payments as projected disposable income.  That holding is contrary to what the Chapter 13 Trustee is requesting in this case.  The last in the trilogy of cases, *Arsenault*, also involved bonuses.  370 B.R. 845.  In that case, the debtor had been paid two annual bonuses in the years before bankruptcy and "anticipated" future annual bonuses.  The bankruptcy court ordered that all "anticipated annual bonuses" must be added to the debtor's projected disposable income.  *Id.* at 852-53.  But, that holding was made without applying the more recent "known or virtually certain" standard adopted by the Supreme Court.

The only directly applicable post-*Lanning* decision noted by the Chapter 13 Trustee is *In re O'Neill Miranda*, 449 B.R. 182 (Bankr. D.P.R. 2011).  In that case, the debtors apparently received "regular Christmas bonuses" in the "approximate combined amount of $2,000 yearly."  *Id.* at 189-90.  The Christmas bonuses were not given during the 6-month look-back period for calculating "monthly disposable income" under Section 101(10A) and Form 122C-1.  Nevertheless, relying on a pre-*Lanning* decision (*Arsenault*, 370 B.R. 845), the bankruptcy court did direct that the debtors' bonuses be included as projected disposable income for purposes of Chapter 13 plan payments.  While respecting the bankruptcy court's decision, the Court notes that the *O'Neill Miranda* bankruptcy court did not engage in any actual assessment of whether future bonuses were "known or virtually certain."

Ultimately, after carefully studying all the legal authorities presented by the Chapter 13 Trustee, the Court determines that such decisions are either distinguishable or unpersuasive in the context of this case.  Furthermore, none of the other cases applies the binding *Lanning* standard.  Under *Lanning*, the Court starts with the "current monthly income" shown on Form 122C-1 and/or the gross income on Schedule I.  In this case, both income calculations were done properly, are not contested, and are in agreement.  So, that is the end of the inquiry because this is not an "unusual case" in which the debtor will have additional future income that is "known or virtually certain."  On the facts, the Debtor's potential for receiving future post-bankruptcy bonuses does

not satisfy the standard.  The Debtor's potential future bonuses need not be included as part of the projected disposable income calculation.  Thus, the Debtor will not be required to increase payments under the Plan above the $465 per month mark proposed by the Debtor to account for possible future bonuses.

      Alternatively, the Chapter 13 Trustee has requested that:

> [i]f there is uncertainty about whether the Debtor will receive bonuses or their amount, a court [should] conclude that while the bonus need not be included in calculating projected disposable income for purposes of plan payments, they must be paid into the plan to the extent that they are received.

(Docket No. 34 at 7; *see also* Obj. ¶ 1 ("The Chapter 13 Plan should be amended to include a provision that "Any net bonus income . . . shall be paid into the Debtor's Chapter 13 Plan"); Docket No. 34 at 2 (". . . the net bonus income should be turned over annually upon receipt")).  In *Barnes,* 378 B.R. 774, the bankruptcy court did exactly that. Since the bonuses at issue in that decision were "somewhat speculative," the bankruptcy court did not require that they be included in calculating projected disposable income.  Instead, in *Barnes*, the bankruptcy court decided to impose a novel condition for confirmation not expressed in the Bankruptcy Code.  In addition to committing all projected disposable income, the debtor was required to also "devote[] to the Plan" any "future bonuses" after a mandatory notice and motion procedure.  *Id.* at 779-80.

      The Court appreciates the Chapter 13 Trustee's role in trying to make sure that the Debtor pays what he is obligated to pay under the Bankruptcy Code.  The Chapter 13 Trustee's alternative turnover request and the *Barnes* decision certainly sound attractive to this Court as a sort of compromise and maybe even good policy.  Indeed, why not mandate a provision in every Chapter 13 Plan that if any debtor ever receives a bonus (anticipated or otherwise) during the five-year plan term, the debtor must transfer the bonus to the Chapter 13 Trustee immediately?  The answer is that Congress did not see fit to include such a creditor-friendly provision in the Bankruptcy Code, which itself is an intricate set of compromises between debtors and creditors.  The Court cannot legislate and cannot just make up a new requirement for confirmation of Chapter 13 plans.  If a debtor is proposing to commit "all projected disposable income" to a Chapter 13 plan (and all other Section 1325(a) requirements are met), the Court cannot deny confirmation.  The Court has no authority to impose yet another demand on debtors. *See Baker Botts L.L.P. v. Asarco LLC*, 135 S. Ct. 2158, 2169 (2015) (the Supreme Court "lack[s] the authority to rewrite the statute" even if it wishes for a different policy result).  Under our constitutional framework, any new Chapter 13 confirmation requirements must be passed by Congress.

      But even though the Court will not impose a new requirement on the Debtor untethered from the text of the Bankruptcy Code, the Court notes that the Chapter 13 Trustee and creditors already are "protected" in some sense by other provisions of the Bankruptcy Code.  The Chapter 13 Trustee may continue to "investigate a debtor's

financial affairs" throughout a bankruptcy case. 11 U.S.C. §§ 704 and 1302. The Chapter 13 Trustee and creditors may also monitor the financial condition of the Debtor by requesting annual federal income tax returns and statements of income and expenditures. 11 U.S.C. §§ 521(f)(1) and (f)(4). Moreover, if the Debtor receives a large bonus during the five-year Chapter 13 plan term, the Chapter 13 Trustee or creditors may request plan modification. 11 U.S.C. § 1329. In that process, the Court may be called to reassess both the debtor's income (including the bonus) as well as the debtor's expenses (which also may have increased). *See Trobiano*, 532 B.R. at 360 (explaining that even if a debtor's future income increases, future expenses may also increase; thus, real disposable income may not actually change). So, even though the Court is not mandating that uncertain future bonuses be included as projected disposable income and is not requiring a provision mandating turnover of future bonuses, other parties continue to retain their rights and remedies under the Bankruptcy Code.

> **2.** **The Debtor's Charitable Contributions Are Reasonably Necessary and May Be  Deducted from Income to Determine Projected Disposable Income.**

The Chapter 13 Trustee also objects to the Plan on the basis that the Debtor's proposed charitable and religious contributions — $240 per month — are neither reasonable nor consistent with a "written documentary history" so may not be included as expenses for projected disposable income purposes. Obj. ¶ 2.[12]

The Bankruptcy Code allows debtors to make certain charitable and religious contributions. Under Section 1325(b):

> (2) . . . the term 'disposable income' means current monthly income received by the debtor . . . less amounts *reasonably necessary* to be expended —
>
> > (A)   (i)   for the maintenance or support of the debtor . . . ; *and*
> >
> > (ii)   for [qualified] charitable contributions . . . *in an amount not to exceed 15 percent of gross income of the debtor* for the year in which the contributions were made . . . . *and*

---

[12]   The Chapter 13 Trustee declined to argue that the proposed charitable and religious contributions are other than "charitable contributions" made to "qualified religious or charitable entit[ies] or organization[s]" under Sections 1325(b)(2)(A)(ii) and 548(d)(3) and (d)(4). The evidence established that the Debtor makes charitable and religious contributions to Alcoholics Anonymous and a church. Thus, the Court accepts that the Debtor's proposed charitable and religious contributions are "charitable contributions" made to properly "qualified religious or charitable entit[ies] or organization[s]" under Sections 1325(b)(2)(A)(ii) and 548(d)(3) and (d)(4).

18

(B)    if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.[13]

(Emphasis added.)  The Debtor's gross annual income is $102,900.  Going forward, he proposes to pay $240 per month (or $2,880 per year) to charitable and religious organizations.  The proposed charitable and religious contributions are well less than the 15% statutory cap.  Instead, such contributions are only a little less than 3% of the Debtor's gross annual income.

Congress has repeatedly amended the Bankruptcy Code to ensure that Chapter 13 debtors may make charitable contributions, including religious donations.[14]  For example, in 1998, Congress enacted the "Religious Liberty and Charitable Donation Protection Act" (the "RLCDPA").  P.L. 105-183, 112 Stat. 517.  Through the RLCDPA, the legislature added qualified "charitable contributions" as permissible expenses under the disposable income definition contained in Section 1325(b)(2)(A), but established a 15% cap on charitable giving for Chapter 13 debtors.  However, Congress apparently inadvertently limited the RLCDPA through the "Bankruptcy Abuse Prevention and Consumer Protection Act" of 2005 ("BAPCPA").  P.L. 109-8, 119 Stat. 37 (2005).  Under the BAPCPA, the legislature created two distinct categories of Chapter 13 debtors: those with below-median income and those with above-median income.  For above-median-income debtors, the BAPCPA seemingly stripped the ability of such debtors to deduct charitable and religious contributions from their "disposable income" by forcing their expenses to be evaluated solely under Section 707(b)(2), which does not contemplate charitable and religious giving.  *See In re Meyer*, 355 B.R. 837 (Bankr. D.N.M. 2006) (court denied confirmation of Chapter 13 plan for above-median-income debtors because religious contributions could not be deducted from projected disposable income); *In re Diagostino*, 347 B.R. 116 (N.D.N.Y. 2006) (above-median-income debtors did not qualify for continued charitable contribution expenses in proposed Chapter 13 plan).

Congress promptly cured the RLCDPA-BAPCPA problem a year later (in 2006) when it enacted the "Religious Liberty and Charitable Donation Clarification Act" (the "RLCDCA").  Pub. L. 109-439, 120 Stat. 3285.  The RLCDCA consisted of a single amendment:  modifying Section 1325(b)(3) to insert the phrase "other than subparagraph (A)(ii) of paragraph (2)."  Although parsing through the various cross-

---

[13]    In his Objection, the Chapter 13 Trustee referred to a myriad of other statutes for his charitable and religious contributions argument including 11 U.S.C. §§ 707(b)(2)(A)(ii)(I-V), 1325(a)(3), 1325(a)(7), and 1325(b)(1)(B).  Obj. ¶ 2.  It is too much.  The Debtor is an "above-median-income" debtor.  Thus, as a general matter, Section 1325(b)(3) provides that "[a]mounts reasonably necessary to be expended under [Section 1325(b)(2)] . . . shall be determined in accordance with [Section 707(b)(2)(A)-(B)]."  However, as explained below, that cross-reference to Section 707(b)(2) does not apply to qualified charitable or religious contributions of above-median-income debtors.

[14]    Interestingly, Congress has not added similar protections for charitable contributions in Chapter 11 and Chapter 12 reorganizations.  *See* 11 U.S.C. § 1191(d) (defining "disposable income" but without reference to expenses for charitable contributions); 11 U.S.C. § 1225(b)(2) (same).

references is a little difficult, what the RLCDCA effectively did was ensure that for above-median-income debtors, a Section 707(b)(2) analysis is not required with respect to qualified charitable and religious contributions. Instead, such contributions are subject only to Section 1325(b)(2)(A)(ii), including the 15% of gross income cap. That way, above-median-income debtors receive the same RLCDPA protections for charitable and religious contributions as below-median-income debtors.

So, the historical evolution of the Bankruptcy Code dictates that all Chapter 13 debtors may now include as part of their legitimate expenses (for purposes of disposable income and projected disposable income calculations) certain qualified charitable contributions, including religious donations. However, there remains a thorny question: How much is permissible? To answer the question, further parsing of the statutory text is necessary. With respect to charitable contributions, the current version of Section 1325(b)(2)(A)(ii), stripped to its bare essentials, provides that "disposable income" means:

> current monthly income. . . less amounts *reasonably necessary* to be expended . . . for [qualified] charitable contributions . . . *in an amount not to exceed 15 percent of gross [annual] income* . . . .

11 U.S.C. § 1325(b)(2)(A)(ii) (emphasis added). The statute establishes an absolute maximum of 15% of a debtor's gross annual income. That much is clear. *Wadsworth v. Word of Life Christian Center (In re McGough)*, 737 F.3d 1268, 1276 n.7 (10th Cir. 2013) (noting, in case related to recovery of fraudulent transfer under Section 548(a)(1)(B), that Section 1325(b)(2)(A) "allows a Chapter 13 debtor to make charitable contributions up to 15% of his or her gross income during the term of the plan"). But does the statute also require that a debtor show that the proposed charitable contributions (even if less than 15% of gross annual income) are "reasonably necessary"? The Chapter 13 Trustee seems to advocate a "reasonably necessary" analysis because he complains about the size of the proposed charitable contributions in comparison to the Debtor's history of giving. Unfortunately, as with many areas of bankruptcy law, there is a solid split of authority.

The first relevant post-RLCDPA decision is *In re Buxton*, 228 B.R. 606 (W.D. La. 1999). In that case, the debtors presented a Chapter 13 plan which proposed that the debtors make charitable contributions of $280 per month while paying the Chapter 13 Trustee only $322 per month. The Chapter 13 trustee objected to confirmation and contended that charitable contributions in Chapter 13 are subject to two limitations: "(1) the amount of the contribution cannot exceed 15% of gross income; and (2) the amount of the contribution itself is reasonable." *Id.* at 609. The *Buxton* court determined that it still must engage in a "reasonably necessary" analysis. *Id.* at 610 ("The definition of 'disposable income' still contains the 'reasonably necessary' restriction.") Ultimately, even though the debtors met the 15% gross income cap, the *Buxton* court denied confirmation on the basis that the proposed charitable contributions were "unreasonable under the circumstances." *Id.* at 611. Other bankruptcy courts have followed the *Buxton* approach. *See In re Davis*, 272 B.R. 5 (Bankr. D. Wyo. 2001) (holding that even

if proposed Chapter 13 religious contributions were below 15% cap, court must still independently evaluate whether such contributions are reasonably necessary; confirmation of Chapter 13 plan denied ).

*Drummond v. Cavanagh (In re Cavanagh)*, 250 B.R. 107, 113 (9th Cir. BAP 2000) represents the opposite viewpoint.  In that case, the debtors proposed to make contributions of $234 per month to their church through their Chapter 13 plan.  The Chapter 13 Trustee asserted that the debtors historically had not made religious donations.  Instead, they "appeared to have 'suddenly found God'" after the bankruptcy filing.  *Id.* at 111.  Thus, the Chapter 13 Trustee objected to confirmation and argued that the proposed donations could not be included in the projected disposable income calculation because they were not "reasonably necessary" even though they were less than 15% of the debtors' gross annual income.  The appellate panel rejected the argument and held:

> Maintenance and support is plainly intended to include charitable contributions that do not exceed fifteen percent.  Accordingly, a court is not supposed to engage in a separate analysis to determine whether charitable contributions up to fifteen percent are reasonably necessary for the debtor's maintenance and support.
>
> . . . .
>
> Under § 1325(b)(2)(A), annual charitable contributions of up to fifteen percent of the debtor's gross income are *deemed reasonably necessary* for the maintenance and support of the debtor."

*Id.* at 112-13 (emphasis added).  The *Cavanaugh* approach has attracted some adherents.  *See In re Petty*, 338 B.R. 805 (Bankr. E.D. Ark. 2006); *In re Kirschner*, 259 B.R. 416 (M.D. Fla. 2001) (rejecting the "vestigial 'reasonably necessary' requirement").

The Court is tempted to follow the *Cavanaugh* line which establishes a *per se* rule that Chapter 13 debtors may always make charitable contributions so long as the amount is less than 15% of gross annual income.  That would be easy.  The Court would not have to interpose itself to adjudge whether particular charitable contributions were "reasonably necessary" or not.  But, the problem is that such approach simply is contrary to the statutory text enacted by the Legislative Branch.

Section 1325(b)(2)(A) defines "disposable income" as "current monthly income . . . less amounts *reasonably necessary* to be expended . . . ."  (Emphasis added.)  Then, Congress established three separate indented subpart categories of potential "reasonably necessary" expenses:  (1) "for the maintenance or support of the debtor . . . ."; (2) "for [qualified] charitable contributions" up to the 15% gross annual income cap; and (3) for expenses in the "operation" of a business.  11 U.S.C. § 1325(b)(2)(A)(i), (b)(2)(A)(ii), and (b)(2)(B).

The Court employs a fair reading method that dictates the primacy of the statutory text.  The inquiry must center on the "language of the statute itself."  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  The starting place is the "plain" or "ordinary" meaning of the text.  *Clark v. Rameker*, 134 S. Ct. 2242, 2246 (2014); *Lanning*, 560 U.S. at 513.  For this Court, a simple and plain reading dictates that qualified charitable contributions are subject to the "reasonably necessary" requirement even if below the 15% of gross annual income cap.  But, since the Bankruptcy Code "standardizes an expansive (and sometimes unruly) area of law," it is the Court's "obligation to interpret the Code clearly and predictably using well-established principles of statutory construction.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012).  So, the Court also resorts to statutory construction.

Numerous standard canons of statutory interpretation dictate that the phrase "reasonably necessary" modifies *all* of the listed categories.  First is structure.  Under the "scope-of-subparts" canon, the prefatory "reasonably necessary" phrase relates to each of the subparts, including "for [qualified] charitable contributions."  *See* Antonin Scalia and Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 156 (Thompson/West 2012) [hereinafter, "READING LAW"].  Even if there were no separate indented subparts in the statute, a prepositive modifier (like "reasonably necessary") typically would modify all similar words or terms in a subsequent series.  This is known as the "series-qualifier canon."  READING LAW at 147.  And the punctuation of Section 1325(b)(2) also dictates the same result.  That is because the phrase "reasonably necessary to be expended" is followed by an elongated hyphen ("—") and then two subparts followed by semi-colons and the word "and" followed by a final subpart ending with a period.  "Punctuation is a permissible indicator of meaning."  READING LAW at 161.

Besides the structure and English grammar, the Court's duty is "to give effect, if possible, to every clause and word of a statute."  *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Inhabitants of Township of Montclair, County of Essex v. Ramsdell*, 107 U.S. 147, 152 (1883)); *Lowe v. SEC.*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").  This is known as the "rule against superfluities," *Hibbs v. Winn*, 542 U.S. 89, 101 (2004), or the "surplusage cannon."  READING LAW at 174.  Cases like *Cavanaugh* simply read the phrase "reasonably necessary" out of Section 1325(b)(2), at least in relation to qualified charitable contributions.  Presumably, such courts still apply "reasonably necessary" when they evaluate other indented subparts such as "for the maintenance and support of the debtor."  But that raises its own problems.  Put rhetorically, how can a prepositive modifier modify some subparts by not others?  In the Court's view, it must give equal meaning to the phrase "reasonably necessary" in relation to all subparts of Section 1325(b)(2).

And, if Congress wanted to eliminate the "reasonably necessary" requirement for qualified charitable contributions, it could have done so quite easily.  *See Buxton*, 228 B.R. at 610 ("Had Congress intended the result suggested by the Debtors [no "reasonably necessary" analysis], it surely knew how to do so.").  For example, the

legislature could have moved the charitable contributions provision to another part of Section 1325(b) not modified by the phrase "reasonably necessary." Or, it could have specified that the phrase "reasonably necessary" did not apply to charitable contributions under Section 1325(b)(2)(A)(ii). But, Congress did not do so. Instead, in 2006 (after *Cavanaugh* and *Kirschner*), the legislature passed the RLCDCA, which amended Section 1325(b)(3). That amendment further clarifies that charitable contributions are a type of expense "reasonably necessary to be expended."

In the end, the Court determines that proposed charitable contributions must be "reasonably necessary" to be subtracted from current monthly income (and used to calculate projected disposable income) even if the amount is less than the 15% absolute cap. *Accord Buxton*, 228 B.R. 606; *Davis*, 272 B.R. 5. But, that result leads the Court to another tough question. How can it decide whether specific charitable contributions, including religious donations are "reasonably necessary"?

There are problems for sure. The phrase "reasonably necessary" is not defined in the Bankruptcy Code. An atheist might suggest that religious contributions are *never* reasonably necessary because they are not required for physical sustenance and there is no economic return. Indeed, prior to the enactment of the RLCDPA and RLCDCA, many bankruptcy courts ruled that religious donations were *per se* not reasonably necessary in Chapter 13 reorganizations because they were not economically justified. *See e.g. In re Tessier*, 190 B.R. 396 (Bankr. D. Mont. 1995); *In re Lees*, 192 B.R. 756 (Bankr. D. Mont. 1994); *In re Miles*, 96 B.R. 348 (Bankr. N.D. Fla. 1989); *In re Sturgeon*, 51 B.R. 82 (Bankr. S.D. Ind. 1985). However, those decisions were effectively abrogated by the RLCDPA and RLCDCA. Thus, at a minimum, we now know that charitable contributions, including religious donations, can be "reasonably necessary" and used in the projected disposable income calculation even though they are not economically justified.

In most cases, the focus of the "reasonably necessary" test is whether the debtor is "maintaining an excessive lifestyle to the detriment of unsecured creditors." *Loper,* 367 B.R. at 665. But that sort of inquiry just does not seem applicable for charitable contributions since charitable giving, by definition, does not result in an excessive lifestyle. So, something else is required to assess charitable contributions. To determine whether particular proposed charitable contributions are "reasonably necessary," the Court elects to look toward neutral factors such as: the historical pattern of charitable giving, if any; the proposed charitable contributions in relation to the proposed Chapter 13 trustee payments; the proposed charitable contributions in relation to proposed distributions to general unsecured creditors; the nature and extent of objections; any evidence suggesting that the proposed charitable contributions are proposed primarily to harm creditors; and the totality of the circumstances. And, of course, even if "reasonably necessary," proposed charitable contributions can never exceed 15% of gross annual income. A neutral approach is required to avoid conflict with the First Amendment of the United States Constitution.

In this case, the Chapter 13 Trustee's complaints about charitable contributions relate only to the Debtor's alleged lack of a track record of charitable and religious

giving.  It is true that the Debtor has taken tax deductions for "gifts to charity" on his 2016, 2017, and 2018 federal income tax returns in amounts that are materially less than $240 per month.  However, the Debtor has explained the discrepancy.  The Debtor has been very conservative in his tax reporting and only claimed deductions if he has actual written receipts.  But the Debtor testified credibly that his actual charitable and religious contributions over the years are much higher than what he claimed for tax deduction purposes.  His evidence was uncontroverted.  He attends church services twice weekly and donates about $10-20 per service.  That tallies to $80-$160 per month.  Also, the Debtor participates in somewhere between 6 to 16 Alcoholics Anonymous meetings per month (80 to 200 meetings per year).  At each meeting he tries to make a small contribution to the organization.  Thus, the Court finds that the Debtor has proved that he has historically spent about $240 per month — maybe more — on charitable contributions and religious donations.

In terms of other factors considered for the neutral "reasonably necessary" analysis, the Debtor has proposed in his Plan to pay $465 to the Chapter 13 Trustee.  That is almost double the amount that he proposes to pay for charitable contributions on a monthly basis.  With respect to general unsecured creditors, the Plan provides that they will be paid $15,274.  That is more than the Debtor proposes for charitable giving in the next five years.  The Court appreciates that the Chapter 13 Trustee has raised a legitimate objection concerning the Debtor's proposed charitable contributions; however, the Court notes that no creditors have objected on such basis.  Considering the totality of the circumstances, the Court assesses the Debtor as having made a real and conscientious effort to balance his right to continue to make some charitable contributions (as affirmed by Congress in the RLCDPA and RLCDCA) against his obligation to pay creditors.  He could have tried to divert all of his disposable income to charitable causes and stiff his creditors.  But, he did not.  There is no evidence of malicious intent to harm creditors through increased charitable contributions.  The Debtor proposed a Plan that takes into account all interests and still tilts economically in favor of creditors (as compared to charities).  Finally, the Court observes that the Debtor's proposed charitable giving is well-below the 15% cap imposed by Congress.  In fact, the Debtor's proposed contributions to his church and Alcoholics Anonymous add up to only about 3% of his gross annual income.  In the end, the Court determines that, under the circumstances presented in this case, the Debtor's proposed charitable contributions are "reasonably necessary" within the context of Section 1325(b)(2) and may be subtracted from current monthly income as part of the projected disposable income calculation under Section 1325(b)(1)(B).  Thus, the Court overrules the Chapter 13 Trustee's objection about charitable contributions.

### 3.   The Debtor Must "Step-Up" Plan Payments after Paying Off the First and Second Loans.

The Chapter 13 Trustee further objects to the Plan and argues that the Debtor is not committing all projected disposable income to the Plan because the Debtor has not provided for "step-up" Plan payments after the Debtor pays off the First and Second Loans from the Debtor's 401(k) Account.  Obj. ¶ 3.  Under the First Loan, the Debtor is obligated to pay the 401(k) Account $258.30 per month until December 2023.  Under

the Second Loan, which was taken out to purchase the Debtor's used vehicle, the Debtor is committed to paying the 401(k) Account $530.22 per month until July 2020.

From the Chapter 13 Trustee's perspective, when the Debtor finishes his payments under the Second Loan in July 2020, he will then have a surplus of $530.22 per month (that has effectively been "freed-up") which should be dedicated to creditors through a $530.22 "step-up" in Plan payments.  So, starting in August 2020, the Debtor should be required to pay the Chapter 13 Trustee $995.22 per month instead of only the $465 per month proposed by the Debtor.  Similarly, the Chapter 13 Trustee argues that when the Debtor pays off the First Loan in December 2023 the Debtor will have an extra $258.30 per month that should be put toward the Plan.  Thus, per the Chapter 13 Trustee, starting in January 2024, the Debtor should be required to "step-up" Plan payments to $1,253.52 instead of the $465 per month proposed by the Debtor.

The Chapter 13 Trustee's argument again focuses on projected disposable income under Sections 101(10A), 1325(b)(1)(B), and (b)(2).  So, the Court must return to *Lanning*, 560 U.S. at 524.  As explained earlier, the Debtor properly calculated current monthly income and disposable income on his Forms 122C-1 and 122C-2 as well as his Schedules I and J.  Generally, "nothing more is required."  *Id.* at 519.  But, given the future payoffs of the First and Second Loan, the question then becomes whether this is one of those "unusual cases" with additional "known or virtually certain" future reductions in expenses based upon the loan payoffs.

Unlike the situation involving uncertain future bonuses, the Court determines that it is "known or virtually certain" that the Debtor will have reduced expenses (resulting in increased projected disposable income) after he completes the payments under the First and Second Loans.  The Debtor's repayment obligations are known and defined by contract.  The Debtor has schedules showing the monthly payment obligations.  The maturity dates are clear.  Moreover, as set forth on the Debtor's Schedule I, the Debtor himself has committed to repaying the First and Second Loans on time.  He appears to have the financial capacity to do so.  And, post-bankruptcy, he has continued to pay the First and Second Loans without default.  Accordingly, it is "known or virtually certain" that the Debtor's expenses will be reduced which will result in additional projected disposable income.  More specifically, he will have an additional $530.22 in projected disposable income as of August 2020 plus an additional $258.30 in projected disposable income as of January 2024.

If it is "known and virtually certain" that a debtor will have more projected disposable income (and there is no evidence of more "known or virtually certain" future expenses), then the debtor must commit the additional projected disposable income and make "stepped-up" Plan payments to the Chapter 13 Trustee.  Strong appellate authority supports the Chapter 13 Trustee's position.  *See Burden v. Seafort (In re Seafort)*, 437 B.R. 204, 213 (6th Cir. BAP 2010) ("the Panel concludes that to obtain confirmation of a chapter 13 plan, debtors are required to commit the income which becomes available after their 401(k) loans are repaid to the payment of unsecured creditors"), *aff'd*, 669 F.3d 662, 663 (6th Cir. 2012) ("We hold that post-petition income that becomes available to debtors after their 401(k) loans are fully repaid is 'projected

disposable income' that must be turned over to the trustee[.]"); *In re Nowlin*, 576 F.3d 258 (5th Cir. 2009) (requiring a step-up in plan payments after payoff of 401(k) loan); *Lasowski*, 575 F.3d 815 (bankruptcy court erred in confirming Chapter 13 plan where debtor did not propose tiered plan increasing Chapter 13 trustee payments after 401(k) loans were paid off).  Lower court decisions also are in accord.  *See In re Kofford*, 2012 WL 6042861 (Bankr. D. Utah Dec. 4, 2012) (denying Chapter 13 plan confirmation because debtor did not "reallocate retirement loan payments to the Plan once retirement loans are paid-off").

Precedent closer to home also supports a "step-up" requirement.  *Zeman v. Liehr (In re Liehr)*, 439 B.R. 179 (10th Cir. BAP Nov. 4, 2010); and *In re Caldwell*, 17-21713 KHT (Docket No. 49) (Bankr. D. Colo. Apr. 16, 2019) (unpublished).  In *Liehr*, Chapter 13 debtors calculated their projected disposable income based upon the "means test" which allowed them to deduct mortgage payments on their residence as an expense.  However, the debtors intended to surrender their home so they would not have future mortgage obligations.  Applying *Lanning*, 560 U.S. at 524, the appellate panel determined that the reduction in mortgage expense from surrender of their residence was "known or virtually certain" and would result in an increase in projected disposable income that "should inure to the benefit of the unsecured creditors, not the [debtors]." *Liehr*, 439 B.R. at 187.  So, the *Liehr* panel reversed plan confirmation.  The *Caldwell* decision reached a similar result requiring a step-up after loans were repaid.  In *Caldwell*, the debtor had two car loans that were scheduled to be paid off during the five-year plan term, but the debtor did not propose to increase Chapter 13 plan payments after the payoffs.  The bankruptcy court determined that the "cessation of car payments is known or virtually certain" and would result in increased projected disposable income.  *Caldwell*, 17-21713 KHT at 4.  Thus, the *Caldwell* court denied confirmation and instead ruled that "the plan must take the [loan] payoffs into account when calculating the Debtor's projected disposable income."  *Id.*; s*ee also Loper*, 367 B.R. at 665 (pre-*Lanning* decision in which court determined that "necessary step-up payments" must be included in Chapter 13 plan after repayment of a retirement plan loan).

The Court concurs with foregoing precedent, especially in the absence of any evidence of "known or virtually certain" increases in expenses.  Therefore, if a debtor will pay off a 401(k) loan during the Chapter 13 plan term, this Court generally will not confirm a Chapter 13 plan unless it provides for a "step-up" to account for the additional projected disposable income available for creditors because the debtor will no longer have the expense of making loan payments.  The Plan does not do what is required.  Therefore, the Court sustains the Chapter 13 Trustee's objection regarding "step-up" payments after payoff of the First and Second Loans.

4.      **The Debtor Cannot Utilize Likely Additional Future Expenses to Offset the Required "Step-Up" Payments After Repayment of the First and Second Loans.**

As a response to the Debtor's "known or virtually certain" reduction in future expenses (resulting in an increase in projected disposable income) by virtue of pay-off

of the First and Second Loans, the Debtor contends that he also anticipates increases in future expenses for his mortgage, home repair, vehicle maintenance, and health care. The Debtor's argument seems to be that such additional future expenses are "known or virtually certain" under *Lanning*, 560 U.S. 505, and so should operate as a sort of offset to the Debtor's additional projected disposable income from payoff of the First and Second Loans. Given that the additional future income and the additional future expenses negate each other, the Debtor suggests that it is all a wash and he should not have to "step-up" Plan payments after payoff of the First and Second Loans.

The Debtor's position has some visceral pull. The Debtor proved that his mortgage expense already has increased and that his home maintenance, repair, and upkeep expenses are likely to be higher than his listed expenses when he filed for bankruptcy. He provided evidence concerning significant vehicle repairs which he is likely to incur in the next few years with respect to his 15-year-old, high-mileage vehicle. In fact, the Debtor financed purchase of his used car with a short-term 401(k) loan (the Second Loan) knowing that when he paid off the Second Loan he would need to redirect what he was paying in monthly loan payments toward critical car repairs. The evidence shows the cost of such repairs will probably be around $5,050. Further, the Debtor demonstrated that he is likely to incur some future medical expenses. During the first nine months of 2019, the Debtor has had 36 different doctor's visits (most after the bankruptcy filing). In additional to bleeding ulcers, the Debtor suffers from the painful degeneration of the disks in his neck and below the base of his skull. Medical intervention is mandated. The Court sympathizes with the Debtor's circumstances.

Although the Debtor has established that his future expenses for his mortgage, home repair, vehicle maintenance, and health care are likely to increase, in the Court's assessment the Debtor's "offset" argument ultimately fails the *Lanning* test. The evidence of anticipated future increased expenses is not especially unusual and doesn't quite meet the high threshold of "known or virtually certain" established by the Supreme Court in *Lanning*, 560 U.S. at 124. For example, on the medical front, the Court accepts that the Debtor suffers from painful degeneration of the disks in his neck and below the base of his skull. The Debtor will need further medical treatment, possibly radiofrequency ablation or neck fusion surgery. But the specific treatment remains uncertain. Radiofrequency ablation is much cheaper and might solve the problem altogether. If so, the Debtor may not need the far more expensive and intrusive surgery option. In any event, as of now, the specific type of necessary medical treatment cannot be characterized as "known or virtually certain."

Neither are the associated costs of the potential but as-of-yet uncertain treatment "known or virtually certain" at this time. The Debtor's own testimony suggested that if radiofrequency ablation is successful, then the Debtor's out-of-pocket costs (after applying insurance coverage) may only be a few hundred dollars. But, that is itself a bit speculative since the Debtor has not been billed for the procedure and the Court cannot know for sure what amounts will be covered by insurance. The Debtor estimated the costs of neck surgery at $100,000. However, that is only an estimate, not something "known or virtually certain." And, given the complexities of insurance coverage, the

27

Court has no way to know for sure how much the Debtor might be required to pay out-of-pocket.

The Debtor's projected future vehicle maintenance expenses suffer from uncertainty as well. He has identified the mechanical problems: non-functioning air conditioning; a bad clutch; and worn wheel bearings. He also obtained an estimate of $5,050 for such repairs. But, again, it is only an estimate. The Debtor testified that the car might not even be able to be repaired at all; so he may need to purchase a different vehicle in the future anyway at a different and potentially higher cost. No one can be sure what will happen. In any event, some increased car expenses are really not that unusual for debtors who often put off maintenance in an attempt to avoid bankruptcy. Indeed, car expenses are so usual that Form 122C-2 includes a category for "Vehicle ownership or lease expense," applying the IRS Local Standards. Such standards allocate $497 per month for operational costs, including costs of needed auto repairs.

The same is true for the Debtor's future home maintenance and repairs expenses. While the debtor has testified that he will need to have his home repainted, he has not offered evidence of the cost of doing this. And again, because home repair expenses are common and not unusual, Form 122C-2 includes a category for "Housing and utilities – Insurance and operating expenses," and allocates $489 per month under the IRS Local Standards.

Another problem is that the Debtor's aggregate potential additional future expenses are not tied to the "known or virtually certain" expense reductions. The Debtor will have an additional $530.22 in projected disposable income as of August 2020 (when he reduces his expenses by paying off the Second Loan) plus an additional $258.30 in projected disposable income as of January 2024 (when he reduces his expenses by paying off the First Loan). Because of the uncertainties in the Debtor's potential additional future expenses for mortgage payments, home repair, vehicle maintenance, and medical care, the amount and timing of such additional expenses simply cannot be matched to offset the required "step-up" payments after payoff of the First and Second Loans.

Notwithstanding, it is certainly possible that the Debtor may incur significant additional future expenses. If so, the Debtor has a ready remedy: modification of the Plan under Section 1329. *See Nowlin*, 576 F.3d at 267 (holding that for events "less than reasonably certain to occur, amendment under 11 U.S.C. § 1329 is the appropriate way to proceed if a party wishes to change the plan").

## C.    The Good Faith Objection.

The Trustee's only remaining objection is that the Debtor has not proposed the Plan in good faith under Section 1325(a)(3), which imposes a confirmation requirement that "the plan has been proposed in good faith and not by any means forbidden by law." The Chapter 13 Trustee's good faith argument is entirely duplicative of the projected disposable income objections. He contends that the Debtor's Plan was not proposed in good faith because: the Debtor does not include as income anticipated future bonuses

28

to be paid in the period from 2020 to 2024; the Debtor's proposed charitable and religious contributions are not reasonable; and the Debtor does not propose "step-up" payments under the Plan after the First and Second Loans from the Debtor's 401(k) Account are paid off in 2023 and 2020, respectively.  As set forth above, the Court already has rejected these same objections under Section 1325(b)(1) and (b)(2); except with respect to the required "step-up" payments.

Congress did not define the term "good faith" in Section 1325(a)(3).  However, within the jurisdiction of the Tenth Circuit Court of Appeals, the seminal appellate precedent on the good faith requirement for plan confirmation in Chapter 13 is: *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir. 1983).  In *Flygare*, the Tenth Circuit Court of Appeals announced a "totality of the circumstances" approach in which:

> The bankruptcy court must utilize its fact-finding expertise and judge each case on its own facts after considering all of the circumstances of the case. If, after weighing all the facts and circumstances, the plan is determined to constitute an abuse of the provisions, purpose or spirit of Chapter 13, confirmation must be denied.

709 F.2d at 1347 (quoting *U.S. v. Estus (In re Estus)*, 695 F.2d 311, 316-17 (8th Cir. 1982)).  The Tenth Circuit adopted a list of eleven factors to be considered in the good faith analysis:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
>
> (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
>
> (3) the probable or expected duration of the plan;
>
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
>
> (5) the extent of preferential treatment between classes of creditors;
>
> (6) the extent to which secured claims are modified;
>
> (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;
>
> (8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.

*Id.* at 1347-48 (quoting *Estus*, 695 F.2d at 317); *see also Mason v. Young (In re Young)*, 237 F.3d 1168, 1174-75 (10th Cir. 2001) (reconfirming *Flygare* factors for good-faith evaluation); *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993) (same); *Pioneer Bank v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 703-04 (10th Cir. 1989) (same). The *Flygare* list is "not exhaustive, and the weight given each factor will necessarily vary with the facts and circumstances of each case." *Flygare*, 709 F.2d at 1347-48.

"The good faith determination is made on a case-by-case basis considering the totality of the circumstances. *Anderson v. Cranmer (In re Cranmer)*, 697 F.3d 1314, 1318-19 (10th Cir. 2012) (citing *Flygare*, 709 F.2d at 1347). Both parties agree that *Flygare* is applicable here. The *Flygare* decision pre-dates changes to the Bankruptcy Code — including to Sections 1325(b)(1) and (2) — made by BAPCPA. However, even post-BAPCPA, the Tenth Circuit has confirmed the vitality of *Flygare*. The key post-BAPCPA decision is *Cranmer*, 697 F.3d 1314.

In *Cranmer*, the debtor presented a Chapter 13 plan based upon the exclusion of Social Security income ("SSI") from the projected disposable income calculation. The Chapter 13 trustee objected to confirmation on two grounds: (1) failure to commit all projected disposable income under Section 1325(b)(1); and (2) lack of good faith under Section 1325(a)(3). The bankruptcy court "concluded SSI must be included in the projected disposable income calculation and that [the debtor's] failure to do so showed he did not propose his plan in good faith." *Cranmer*, 697 F.3d at 1316. Thus, the bankruptcy court denied confirmation. The district court reversed and held that "SSI need not be included in the projected disposable income calculation and failure to include it did not show . . . bad faith." *Id*.

On further appeal, the Tenth Circuit sided with the district court and determined that SSI need not be included in the projected disposable income calculation. With respect to the Chapter 13 Trustee's good faith objection, the appellate panel endorsed *Flygare* and instructed:

The good faith determination is made on a case-by-case basis considering the totality of the circumstances. *Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983). In evaluating a debtor's good faith, courts should consider eleven non-exclusive factors [from *Flygare*] as well as any other relevant circumstances.

30

*Cranmer*, 697 F.2d at 1318-19.  However, after listing the *Flygare* factors, the Tenth Circuit recognized a "more narrow focus" for "good faith" inquiries post-BAPCPA.  The appellate court stated:

> Since *Flygare* was decided, however, the Bankruptcy Code was amended to include 11 U.S.C. § 1325(b). . . .  Section 1325(b)'s "'ability to pay' criteria subsumes most of the *Estus* factors" and, therefore, the good faith inquiry now "has a more narrow focus." . . .  A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."

*Cranmer*, 697 F.3d at 1319, n.5 (quoting *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987)).  Turning to the facts in *Cranmer*, the Tenth Circuit rejected the Chapter 13 trustee's good faith objection, holding:  "When a Chapter 13 debtor calculates his repayment plan payments exactly as the Bankruptcy Code and the Social Security Act allow him to, and thereby excludes SSI, that exclusion cannot constitute a lack of good faith."  *Id.* at 1319.

With respect to the *Cranmer* factors, in this case, the Debtor stated his material debts and expenses accurately.  If there are any discrepancies on the Debtor's Schedules they are only understatements of the Debtor's actual expenses (which have also increased since the bankruptcy petition).  Any errors are not significant and have no negative impact on creditors.  The Chapter 13 Trustee has not argued that the Debtor made any fraudulent misrepresentation to mislead the Court.  He has not. Instead, the Court finds that the Debtor has been forthcoming, honest, and credible in his filings and testimony.  Finally, the Debtor has not unfairly manipulated the Bankruptcy Code.  The Chapter 13 Trustee relies on his projected disposable income objections to negate the Debtor's good faith.  However, the Court already has ruled in favor of the Debtor on most of the projected disposable income objections.  Ultimately, the Court must deny confirmation because the Debtor has not proposed "step-up" payments after payoff of the First and Second Loans.  However, if the Debtor amends his Plan to incorporate such "step-up" payments, then the Court would ascertain no lack of good faith under Section 1325(a)(3).

## D.    **The Reporting Objection.**

At trial, the Chapter 13 Trustee argued alternatively that, at a bare minimum, the Debtor should be required to: (1) provide his federal income tax returns to the Chapter 13 Trustee each year; and (2) report annually whether or not he received a bonus and, if so, how much (since bonus information is not identified separately on federal income tax returns).

The Bankruptcy Code imposes many duties on Chapter 13 trustees.  Such duties include, among others:  "investigat[ing] the financial affairs of the debtor"; "appear[ing]

. . . at any hearing that concerns . . . confirmation of a plan [or] modification of a plan after confirmation"; and "advis[ing] . . . and assist[ing] the debtor in performance under the plan. 11 U.S.C. §§ 704(a)(4) and 1302(b). Chapter 13 trustees also may request modification of confirmed plans to "increase or reduce the amount of payments . . . ." 11 U.S.C. § 1329(a)(1). The role of the Chapter 13 trustee is absolutely central to the entire Chapter 13 bankruptcy process. Without the active and capable participation of Chapter 13 trustees, the entire system set up by Congress undoubtedly would fail.

To enable Chapter 13 trustees to perform these duties, the Bankruptcy Code imposes certain duties on Chapter 13 debtors. For example, a debtor must "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties . . . ." 11 U.S.C. § 521(a)(3). Both the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure broadly empower Chapter 13 trustees to gather information in Chapter 13 cases. Under Section 521(f)(1), Chapter 13 trustees may request "a copy of each Federal income tax return required under applicable law . . . with respect to each tax year of the debtor while the case is pending . . . ." Further, Chapter 13 trustees may request "annually after the plan is confirmed and until the case is closed . . . a statement, under penalty of perjury, of the [annual] income and expenditures of the debtor . . . . and of the monthly income of the debtor, that shows how income, expenditures, and monthly income are calculated . . . ." 11 U.S.C. § 521(f)(4). The Court refers to this as the "Post-Confirmation Statement of Income and Expenses." The Post-Confirmation Statement of Income and Expenses must disclose "the amount and sources of the income of the debtor." 11 U.S.C. § 521(g)(1)(A). Chapter 13 trustees also may conduct examinations of debtors or other entities regarding:

> . . . the financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or the debtor's right to a discharge" as well as "the source of any money or property acquired or to be acquired by the debtor for the purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan.

Fed. R. Bankr. P. 2004(b).

The Chapter 13 Trustee has requested that the Debtor send to the Chapter 13 Trustee all of the Debtor's post-confirmation federal income tax returns. Under the circumstances of this case (especially with the uncertainty of possible future income from bonuses or otherwise), the request makes abundant good sense and is entirely warranted. *See In re Deliz-Medina*, 2013 WL 5952409, at *3 (Bankr. S.D. Fla. Nov. 7, 2013) ("[T]he Trustee has the right to request that any debtor must comply with the obligations of 11 U.S.C. § 541(f)(1)-(4) [requiring debtors to provide copies of federal income tax returns upon request]; requiring that this [requirement to provide federal income tax returns] be noted in the chapter 13 plan is beneficial to all parties."); *In re Grunauer*, 2010 WL 2425945, at *4 (Bankr. E.D. Va. June 9, 2010) (ordering as part of confirmation process that "[d]uring the term of the plan, the debtor shall, within 14 days of filing her federal and state income tax returns, furnish a complete copy (including all

schedules) to the trustee").  Obtaining post-confirmation tax information will assist the Chapter 13 Trustee in determining whether any modification of the Plan is necessary.  *In re Pautin*, 521 B.R. 754, 764 (Bankr. W.D. Tex. 2014) (the requirement to submit tax returns "assists a trustee's determination if a modification is warranted based upon additional income"); *In re Slusher*, 359 B.R. 290, 304–05 (Bankr. D. Nev. 2007) (stating that Section 1329 is bolstered by the reporting requirements of Section 521(f)).

Similar plan provisions requiring turnover of federal income tax returns are common in many other jurisdictions.  *See* Official Form 113 Chapter 13 [National Model] Plan Part 2.3 (including a check box for "Debtor(s) will supply the trustee with a copy of each income tax return filed during the plan term . . . ."); *In re Reichard*, 2018 WL 3323870 (Bankr. D. Ariz. July 5, 2018) (referencing Arizona local Chapter 13 plan form that mandates submission of post-petition federal income tax returns and determining that such requirement is consistent with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure); *In re Sanchez*, 2016 WL 6127507, at *2 (Bankr. S.D. Fla. Oct. 19, 2016) (detailing "income verification language" in common use in bankruptcy cases: "Pursuant to Section 521(f)(1), the Debtor(s) shall provide a copy of each federal income tax return to the Chapter 13 Trustee required under applicable law, with respect to each tax year of the Debtor ending while the case is pending under such chapter."); *U.S. Trustee v. Standiferd (In re Standiferd)*, 2008 WL 5273690, at *9 (Bankr. N.M. Dec. 17, 2008) ("Plaintiff seeks to deny [debtor's] discharge . . . based [upon debtor's] . . . failure to provide tax returns as required under the order confirming the [debtor's] chapter 13 plan.").  However, whether the Debtor will provide income tax returns to the Chapter 13 Trustee is not really contested in this bankruptcy case since, to his credit, the Debtor has already included this obligation in the Plan at Part 12.  So, the Court approves the provision of the Plan requiring the Debtor to supply the Chapter 13 Trustee with post-confirmation federal income tax returns.

But, the Chapter 13 Trustee also has requested something more — that the Debtor be required in his Plan to report annually whether or not he received a bonus and, if so, how much.  According to the Chapter 13 Trustee, such reporting is necessary because bonus information is not identified separately on federal income tax returns.  The Court finds that while complying with such request may impose some additional burden on the Debtor, such request may be made by the Chapter 13 Trustee under Section 521(f)(4) and (g).  Upon the Chapter 13 Trustee's request, the Debtor is obligated to submit annually a "statement . . . of the income and expenditures of the debtor during the tax year of the debtor most recently concluded before such statement is filed" that includes the "amount and sources of income of the debtor."  And, the request has effectively been made through the Plan objection process.  Moreover, while the Chapter 13 Trustee is generally entitled to such information upon request under the Bankruptcy Code, the Court finds that in the unique circumstances of this case, such a request is especially warranted and appropriate to assist the Chapter 13 Trustee in meeting his duties.  Thus, in any confirmation order in this case, the Court will order the Debtor to comply by providing such information annually.  Alternatively, the Debtor may add such a provision to any amendment of the Plan.

## VI.    <u>Conclusion and Order</u>

For the foregoing reasons, the Court will deny confirmation of the Plan in its current form.  However, if the Debtor amends the Plan to provide for "step-up" payments after payoff of the First and Second Loans, then the amended Plan likely will be confirmable.

IT IS, THEREFORE, ORDERED:

1.    The Chapter 13 Trustee's Objections are OVERRULED in part and SUSTAINED in part as set forth herein.

2.    The Debtor's Amended Chapter 13 Plan (Docket No. 26) is DENIED as unconfirmable in its current form.

3.    By separate Order, the Court shall set a new schedule for the Debtor to submit an amended Plan conforming with terms of this Opinion and Order.

DATED this 16th day of December, 2019.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge